George F. Nixon, Appellant, *v.* Aquilino Zuricalday and George T. McKinney, Respondents.

*Sales — allowance made on the purchase price to induce a purchaser to buy in his own name — not earned, where the purchase is made through a broker.*

Upon the trial of an action brought to recover the purchase price of certain dates, it appeared that auctioneers, about to sell a large consignment of dates, agreed with certain persons, including the defendants, who were extensively engaged in the trade, that they would give them certain allowances on the prices bid provided the merchants purchased the dates in certain quantities, but that there should be " no brokerage and no allowance on any purchases made through brokers." A sufficient quantity of dates was purchased by the defendants to entitle them to an allowance, but the purchase was made by a broker, who had an undisclosed interest in the defendants' firm, in his own name. It was proved that the object in granting the allowance was to stimulate, by the presence of these merchants, or their known representative, other bidders, and thus to better the market.

*Held,* that, by their purchase through a broker, the consideration for the agreement to make the allowances had failed, and that the auctioneers were entitled to recover of the defendants the full amount of the purchase price, without any deduction whatever.

A public auctioneer who sells goods for another may maintain an action for the price, and so may an assignee of such auctioneer.

O'Brien, J., dissented.

Appeal by the plaintiff, George F. Nixon, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 20th day of February, 1896, upon a dismissal of the complaint directed by the court after a trial before the court and a jury at a Trial Term of the Supreme Court held in and for the county of New York.

The complaint alleges a sale by certain auctioneers to the defendants of certain goods, wares and merchandise, consisting of 8,310 boxes of dates, under an agreement on the plaintiff's part, " That plaintiff should make an allowance of one-eighth cent per pound on purchases by defendants of not less than 4,000 boxes and one-quarter cent per pound on purchases of not less than 8,000 boxes, but that there should be no brokerage and no allowance on any purchases made through brokers." Two causes of action are set forth, both of which have been assigned to the plaintiff by the auctioneers.

First Department, December Term, 1896.　　　[Vol. 12.

The first is for the purchase price of 3,942 boxes of dates, amounting to $8,476.11. The second is for the price of 4,368 boxes, amounting to $9,273.33. It is alleged that the dates specified in the second cause of action were purchased by the defendants through a broker, one Elias; and so that no allowance became due them upon this lot of goods. It is also alleged that no allowance became due upon the lot of goods specified in the first cause of action, for the reason that that lot consisted of less than 4,000 boxes.

The answer admits the sale and delivery of all of the dates and the prices thereof; but alleges that the agreement did not contain the condition prohibiting purchases through brokers; and also that said Elias, who bid in the dates specified in the second cause of action, was jointly interested with the defendants in the purchase thereof. The defendants paid into court the sum of $16,535.16, being the full purchase price of $17,749.44, less the allowance claimed, amounting to $1,214.28. The sole dispute is as to the plaintiff's right to recover this latter sum.

There has been a previous trial of the action. Upon the first trial the plaintiff recovered a verdict, directed by the court, the judgment entered upon which was affirmed at General Term, but reversed by the Court of Appeals. Upon the present trial the complaint was dismissed by the court, and the plaintiff appeals.

*C. N. Bovee, Jr.,* for the appellant.

*Emmet R. Olcott* and *James L. Bishop,* for the respondents.

Barrett, J. :

The previous reversal in the Court of Appeals (144 N. Y. 300) proceeded upon the distinct ground that the plaintiff had failed to prove the agreement as alleged in the complaint, and that the agreement, as proved by one of the defendants, consisted merely " in the plaintiff's proposition to him that, if he would purchase up to 4,000 or to 8,000 boxes at the sale, he would allow him one-eighth of a cent per pound on the former amount, or one-fourth of a cent on the latter amount." It was held that there was nothing in such an agreement to require the defendants personally to bid at the sale. " It is possible," said Judge Gray, " that the plaintiff may have had the notion, when making his proposition, that the personal attendance of the defend-

ants and their bidding *would stimulate other bidders*, or otherwise better the market. But if such was the underlying consideration in his mind, there should have been some evidence of it, and it should not have been left to assumption alone. * * * How are we to assume that the fact of the defendants' bidding in person at the sale would be any more potent a factor in the market than if they procured the aid of another person interested with them in their ventures, as Elias was, to bid for them during the sale? The record is silent. We do not know from the evidence that the defendants occupied any such position in the peculiar market as to give them any prestige."

The present record is not silent upon these points. Every suggestion made by Judge Gray has been fully met by the evidence adduced upon the trial now under review. In the first place, the plaintiff proved the agreement as averred in the complaint. This agreement was in the words and figures following.

"Renown Auction.

"*Nov. 4th* (if ready).

"1-8 c. per lb. allowance on purchases of not less than 4,000 Bx.

"1-4 c. per lb. allowance on purchases of not less than 8,000 Bx.

"No Brokerage & no allowance on any purchases made through Brokers.

"No lowest price.

"Full amount of invoice to be paid Brown & Seccomb.

"The allowance — if any — to be paid by me.

"Condition with allowance Strict Secrecy.

"C. F. NIXON."

The plaintiff testified that he exhibited this paper to Mr. McKinney, one of the defendants, who "took a rough copy of it." Thus it clearly appears that there was to be no allowance on any purchase made through brokers. That this meant on any purchase made through persons *apparently* bidding as brokers is now entirely clear. The plaintiff's object in making the contract was to make the dates sell well. This appears from the defendants' own testimony. McKinney testified that the plaintiff came to him and said: "*In order to make those dates sell well*, I have made arrangements with a number of other houses, and include you in that number, in order

that the leading houses in the trade shall buy a certain quantity of dates and get a certain allowance." McKinney added that, in offering the allowance to him, the plaintiff did not mean him personally, but his firm, Zuricalday & Co.; that plaintiff meant to give the allowance upon goods "*purchased in our name,* Zuricalday & Co." The plaintiff corroborated this by testifying that he made the proposition because McKinney " was a member of a large jobbing firm, and the fact of his buying would probably enhance the value of the remainder of the dates, which wouldn't be the case when the purchases were made through a broker, and not direct by the party concerned." The plaintiff made this same proposition to five of the largest fruit dealers in the city, the defendants and four others. That both parties understood the plaintiff's object in offering the allowance, is thus perfectly evident. It is also quite evident that they both understood that purchases made apparently through a broker would frustrate this object. To make the dates sell well, to stimulate other bidders, it was essential that these great houses should bid themselves, or at least that the bidding should be in their names. The effect of bidding by a well-known broker in his own name would probably be quite the reverse. It would naturally tend to a sacrifice of the dates. Be that as it may, the parties here clearly contracted for whatever advantage might be derived from the defendants' name, prestige and standing. Their personal interest in the bidding, to be publicly avowed at the sale, was the main consideration for the allowance which the plaintiff agreed to make. When that consideration failed, the plaintiff's agreement founded thereon fell.

It is said that the defendants notified Rawlinson, the auctioneer's clerk, the day before the sale, that any purchases at the sale would be for them, whether made by Elias or by McKinney. This was not notice to the plaintiff or to the auctioneers; and there is no proof that Rawlinson conveyed the notice to his principals or to the plaintiff. But, even if he did, the notice did not vary the agreement. The notice was that all dates purchased by Elias at the sale " would be together with Zuricalday." The agreement did not forbid Zuricalday entering into any joint adventure with Elias or any one else with respect to these dates. But it limited the allowance to be paid to Zuricalday & Co. to purchases made by them

or in their name. That is what McKinney says the plaintiff meant. And that is plainly what the agreement meant. If Elias had publicly announced at the sale that he was bidding for Zuricalday & Co., that might have been within the spirit and intent of the contract. He was well known as a mere broker and not as a dealer. When he bid without giving any name, no one present could have connected a great house like Zuricalday's with his purchase. It is true that he subsequently gave up the name of Zuricalday & Co. as the purchasers. But that was not to the public. It was simply to the auctioneers, and was apparently after the sale. There was not the slightest necessity for putting Elias forward in this manner. McKinney was present himself, and bid in nearly 4,000 boxes of dates. He could just as readily have bid in the rest. Why did he not do so, and why was Elias put forward to do it for him, secretly, so far as the public was concerned? The plaintiff furnishes the probable answer when he tells us that McKinney came to his office half an hour before the sale and asked him to give the same allowance " off the lowest price ; " that he declined to do so ; and that McKinney said, " Very well, then, I will work all I can against you." He seems to have executed his threat when he stood by and, without personal competition, permitted one who was known to the trade as a broker, and who was apparently acting as such, to secure the major part of those very 8,000 boxes upon the purchase of which the defendants were to have their allowance. And now the defendants say this was not done through a broker, because the particular broker through whom it was done was secretly interested with them in the transaction. We can hardly think that this claim is made in good faith. It certainly is not within either the letter or the spirit of the contract.

As to the point that the plaintiff could not sue as assignee of the auctioneers, we need only to refer to the case of *Minturn* v. *Main* (7 N. Y. 220), where it was expressly held that a public auctioneer who sells goods for another may maintain an action for the price.

We have not considered the questions which were raised as to the " secrecy " branch of the contract for the reason that the point first discussed seems to be crucial and conclusive against the right to the allowance claimed. But we have not overlooked the fact that Elias testified to a distinct breach of this provision of the agreement, and

that when he bid at the sale he was quite cognizant of the contem-
plated allowance.

No question was raised as to the legality of the contract. The
plaintiff does not seek to escape his obligation upon the ground that
the agreement was against public policy. Nor do the defendants
make any point on that head. Indeed, their only hope of recover-
ing this allowance lay in the legality of the plaintiff's promise.

The judgment should be reversed, and a new trial ordered, with
costs to the appellant to abide the event.

RUMSEY, WILLIAMS and INGRAHAM, JJ., concurred; O'BRIEN, J.,
dissented.

O'BRIEN, J. (dissenting):

I dissent from the view of the majority. The construction of the
agreement between the parties, as shown by the opinion of the
majority, is, that as to defendants, " their personal interest in
the bidding, to be publicly avowed at the sale, was the main con-
sideration for the allowance which the plaintiff agreed to make.
When that consideration failed, the plaintiff's agreement founded
thereon fell." It is not claimed that, in the written memorandum
of the agreement, or in any conversation relating thereto before the
sale, anything was said about personal bidding at the sale. The
terms upon which the allowance was to be made did not require
that a member of defendants' firm should bid in person. Any
employee of Zuricalday & Co. might bid, and so could a person
interested on joint account with them. The terms precluded bids
by or allowances to brokers. As said by the Court of Appeals (144
N. Y. 304): " Elias was not a broker in the transaction. He was,
and he had been for some time, interested with defendants on joint
account. * * * There was nothing in the transaction with the
plaintiff which debarred Elias from continuing to participate with
the defendants in the proposed purchase, as he had done in the past.
It was easy for the plaintiff to have limited, and to have precisely
defined his engagement towards the defendants, with respect to their
purchases of his goods. But he did not do so, and the fact is that the
defendants did purchase over 8,000 boxes; which entitled them to
the allowance agreed upon by the plaintiff."

It is insisted that the evidence now before the court does limit the allowance to bids made personally by the defendants. As observed, there is no such limitation in the memorandum or paper of the agreement which was shown McKinney, and which embraces all the terms. Nor should the motive which Nixon says influenced him in making the agreement be considered, because it was not disclosed to defendants. It is manifest that the defendants were aware of no such motive or limitation. For they notified the bookkeeper of the auctioneer before the sale that purchases by Elias were for joint acccount and were to be charged to defendants, and on completion of sale that they were buying together for Zuricalday & Co. In availing themselves of the offer of an allowance, had they supposed that they must bid in person, why should they not have done so? That they did not is evidence that they never knew, or had any reason for knowing, that any such limitation was affixed to the offer.

The testimony of Nixon that McKinney said, " Very well, then, I will work all I can against you," furnishes no reason for not bidding in the name of his firm, but in the name of Elias, for the effect of that would be, on plaintiff's theory of the agreement, to injure Zuricalday & Co. by depriving them of the allowance.

To import into the agreement "a personal trust, which could be discharged only by the personal acts of the defendants, or by the authorized and announced use of their names at the auction sale," is to import a new and additional term which the parties did not agree to, and of which Zuricalday & Co. had no knowledge. If we are to speculate about the motives that influenced plaintiff, and which were never communicated to the defendants, we have, in addition to the one suggested, equal reason for inferring that plaintiff desired the attendance of several bidders to quicken the sale, and, therefore, purchases by the defendants through several representatives in their several names would more effectually accomplish that object.

Again: What plaintiff undoubtedly sought was good prices and large purchases. It is a common practice in trade to give to those purchasing large quantities, as against smaller dealers, a larger discount. Here the allowance was based on the quantities purchased by defendants; and it is conceded that, but for the bidding done by

Elias, the defendants would be entitled to the allowance. To deprive them of such allowance after they had purchased the agreed quantity, upon the theory of a term or limitation not in the memorandum, as communicated to them, seems to me inequitable and unjust.

As no stress is placed upon the argument that the defendants forfeited their right to an allowance by disclosing to Elias the proposition for an allowance, I pass it over with the remark that, as he was jointly interested, telling him was simply telling themselves, for the sale was to them.

I think the judgment was right and should be affirmed.

Judgment reversed, new trial ordered, costs to appellant to abide event.